[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 19, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-16479

_____

D. C. Docket No. 00-01838 CV-C-W

ELIZABETH BESS, DEBORAH GEORGE,
TERRY STOUGH, individually and as
representatives of a class of similarly
situated persons,

                                        Plaintiffs-Appellees,

versus

CHECK EXPRESS, d.b.a. PAYDAY NOW,
QUIK PAWN SHOP FRANCHISING, INC., et al.,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____
**(June 19, 2002)**

Before BIRCH, COX and ALARCON[*], Circuit Judges.

COX, Circuit Judge:

_____

[*]Honorable Arthur L. Alarcon, U.S. Circuit Judge for the Ninth Circuit,
sitting by designation.

Express Check Services, Inc., doing business as PayDay Now ("PayDay"), and Quick Pawn Shop Franchising, Inc., Frank Evans, Charlotte Evans, and Jeffrey Evans (collectively referred to as "the other defendants"), appeal the district court's denial of their motion to compel arbitration of the claims against them by Luna Clifton Colburn. We vacate and remand for a trial on how many of Colburn's claims are subject to arbitration.

## I. Background

This lawsuit was filed as a class action against PayDay and the other defendants for alleged violations of state and federal law arising out of "check advances" or "deferred payment transactions" between the plaintiffs and defendants. In such transactions, a customer writes a check to the vendor in exchange for an immediate cash payment in an amount less than the face value of the check. (R.1-52 at ¶ 1.) The vendor agrees to hold the check for a specified period of time, generally five to fourteen days. Upon the expiration of the agreed time, the customer may redeem the check by paying back the full face value, or the vendor will present the check for payment. (*Id.*) The plaintiffs allege that deferred payment transactions actually are loans governed by the Alabama Small Loan Act, Ala. Code § 5-18-1, *et seq.*, and that PayDay and the other defendants violated this statute by making loans to the plaintiffs without the requisite license and at usurious rates of interest. The plaintiffs also allege

2

that the collection of this usurious interest constituted the collection of an unlawful debt in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*[1]

Colburn was added as a named plaintiff by way of an amended complaint. The amended complaint alleges that Colburn engaged in three deferred payment transactions with PayDay: on January 11, 2000; on February 4, 2000; and on February 18, 2000. (R.1-16 at ¶¶ 19-21.) The record also indicates that Colburn engaged in two other deferred payment transactions with PayDay: on May 26, 2000 (R.1-9, Ex. B); and on June 9, 2000 (R.1-17, Evans Aff.). At some point, Colburn signed an arbitration agreement, which reads as follows:

> I understand that if I have any dispute(s) with Express Check Services, Inc., including any of its past, present, and future officers, directors, agents, employees, representatives, parents, subsidiaries, affiliates, predecessors, successors, heirs and/or assigns (hereinafter referred to collectively as "Express Check Services, Inc.") arising out of or in connection with the Check Advance or any other aspect of my transaction with Express Check Services, Inc. (as defined above), including, but not limited to, the Check Advance transaction, the terms of the Check Advance, representations concerning any aspect of the Check Advance transaction, the money advanced, the Check Advance charges assessed, the payments made, or the recovery of any funds due Express Check Services, Inc. (as defined above), I HEREBY AGREE that any such dispute(s) shall be resolved only through binding arbitration. The arbitration will be conducted under the rules of the

---

[1] In addition to their claims for violations of the Small Loan Act and RICO, the plaintiffs assert various other claims under Alabama law.

American Arbitration Association ("AAA") that are in effect at the time the arbitration is commenced. The arbitrator may, in his or her discretion, allow discovery as per the Alabama Rules of Civil Procedure. Although the arbitration shall be conducted pursuant to the rules of the AAA, the arbitration shall not be conducted through the AAA unless otherwise agreed to by the parties. I FURTHER UNDERSTAND THAT ARBITRATION SHALL BE THE EXCLUSIVE METHOD OF RESOLVING ANY AND ALL DISPUTES, AND I AM WAIVING MY RIGHT TO HAVE SUCH DISPUTES RESOLVED THROUGH A TRIAL BY JURY.

(R.1-17, Ex. A.) Although the arbitration agreement is signed, it is not dated. There is no evidence in the record as to whether Colburn signed any other arbitration agreements, nor is there evidence that any of the other named plaintiffs signed arbitration agreements.

Invoking the arbitration agreement, PayDay and the other defendants moved to compel arbitration of Colburn's claims pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.* Colburn opposed this motion, *inter alia*, on the following grounds: the arbitration agreement could not be enforced because the deferred payment transaction in general was void as illegal under Alabama law; the arbitration agreement was void on its face because it is undated; and the arbitration agreement is unconscionable. Without holding an evidentiary hearing, the district court denied the motion to compel arbitration simply by stamping "DENIED" on the motion, offering no reasons for the denial.

PayDay and the other defendants filed a notice of appeal from the denial of their motion to compel arbitration. After hearing oral argument, we remanded this case to the district court for the limited purpose of explaining its denial, retaining jurisdiction in this court over the appeal. *Bess v. Check Express*, No. 00-16479, unpublished (11th Cir. Oct. 2, 2001). On remand, the district court entered findings of fact and conclusions of law in support of its denial of the defendants' motion. After finding that the arbitration agreement fails to specify certain details about the method of arbitration, including the costs of such, the district court found that Colburn is unable financially to pay more than $150.00 to resolve his claim against PayDay and the other defendants. The district court also found that, should it appoint an arbitrator, the fee would be at least $150.00 per hour and the arbitration would require at least four hours. Based on these findings, the district court concluded that Colburn could not afford to pay his share of the arbitration costs, and it expressly relied on this court's decision in *Randolph v. Green Tree Fin. Corp.–Alabama*, 178 F.3d 1149 (11th Cir. 1999), *aff'd in part and rev'd in part*, 531 U.S. 79, 121 S. Ct. 513 (2000), in refusing to enforce the arbitration agreement.

We ordered supplemental briefing on the issues presented by the district court's order following remand. Having reviewed the supplemental briefs, we proceed to consider the issues raised in this appeal.

5

## II. Jurisdiction and Standard of Review

This court has jurisdiction over this appeal pursuant to 9 U.S.C. § 16(a). We review de novo the district court's denial of the motion to compel arbitration. *See, e.g.*, *Perez v. Globe Airport Sec. Servs., Inc.*, 253 F.3d 1280, 1283 (11th Cir. 2001).

## III. Discussion

PayDay and the other defendants contend that the district court's reliance on *Randolph v. Green Tree Fin. Corp.–Alabama*, 178 F.3d 1149 (11th Cir. 1999), which was reversed in relevant part by the Supreme Court, *see Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 121 S. Ct. 513 (2000), necessitates reversal of the district court's decision. Colburn, on the other hand, asserts that the district court's holding in this case is distinguishable from *Randolph*, and he additionally argues that we may affirm the district court on several alternative bases. We conclude that the district court's articulated reason for denying the motion to compel arbitration cannot be sustained in light of the Supreme Court's decision in *Randolph*. We also conclude that Colburn's alternative arguments concerning the illegality of the deferred payment transactions and the unconscionability of the arbitration agreement do not provide adequate grounds for affirming the district court. Colburn's argument that the arbitration agreement cannot be enforced because it is undated, however, raises unresolved questions of fact that necessitate a remand to the district court.

6

## A. *The District Court's Articulated Reason*

As explained above, the district court expressly declined to enforce the arbitration agreement on the authority of this court's decision in *Randolph*. In that case, a panel of this court determined that an arbitration provision in a retail installment contract was unenforceable because it potentially gave rise to high costs to the party pursuing arbitration. *See Randolph*, 178 F.3d at 1158. Specifically, the arbitration clause said nothing about the payment of filing fees, the apportionment of the costs of arbitration, the ability to waive such fees and costs due to financial hardship, or the set of rules that would govern the arbitration. *Id.* The lack of specificity as to these matters meant that neither the court nor the parties possessed adequate information about how claimants would fare under the arbitration clause. *Id.* For this reason, the court determined that the clause potentially could lead to prohibitive costs and therefore failed to safeguard the plaintiff's ability to vindicate her rights. Accordingly, the court held that the clause was unenforceable. *Id.*

The Supreme Court reversed this holding because the record failed to show that the plaintiff in fact was likely to bear prohibitive costs if the dispute went to arbitration. *See Randolph*, 121 S. Ct. at 522. Although the plaintiff asserted that the American Arbitration Association ("AAA") would conduct the arbitration, and therefore assumed that its filing fees and arbitrator fees would apply, the Court

7

pointed out that no factual showing was made to support these assertions. Instead, the plaintiff "relied entirely on unfounded assumptions," which "provide[d] no basis on which to ascertain the actual costs and fees to which she would be subject in arbitration." *Id.* at n.6. The only fact established by the record was that the arbitration clause was silent on the subject of fees and costs, and that fact alone was "plainly insufficient" to render the clause unenforceable. *Id.* at 522. As the party seeking to invalidate the arbitration clause on the basis of prohibitive costs, the plaintiff bore "the burden of showing the likelihood of incurring such costs." *Id.* Because she failed to meet that burden, the Court rejected this court's conclusion that the clause was unenforceable.

Similarly, we must reject the district court's rationale for refusing to enforce the arbitration agreement in this case. Although Colburn attempts to distinguish the district court's holding from the rejected holding in *Randolph*, we find no meaningful distinction. The district court specifically found that the arbitration agreement does not specify the manner in which arbitration is to be commenced or the manner in which an arbitrator is to be chosen by the parties. Additionally, the district court found that, like in *Randolph*, the arbitration agreement is silent on the issue of arbitration costs. The district court then found, without any citation to the record, that the arbitrator's fee would be at least $150.00 per hour if the court were to appoint an

8

arbitrator, and that the arbitration of Colburn's claims against PayDay would require at least four hours. Finally, without any findings about how these fees and costs would be allocated or what amount Colburn might actually be expected to pay, the district court concluded that Colburn could not afford the costs of arbitration. We have reviewed the record and can find no support for the district court's findings concerning the costs that Colburn likely would bear in arbitration or his ability to pay those costs. Because the record does not show that Colburn likely will incur prohibitive costs, this case is indistinguishable from *Randolph.*

We acknowledge that, unlike the arbitration clause in *Randolph*, the arbitration agreement in this case provides that arbitration will be conducted under the rules of the AAA. Colburn contends that the district court made findings of fact as to Colburn's costs under those rules, and therefore, this case is different from *Randolph*. We disagree for two reasons. First, although the district court discussed the fees and costs set forth under various rules of the AAA, it specifically found that there is no uniform set of AAA rules and that the arbitration clause failed to specify which set of rules were applicable. The district court could not have made any findings about Colburn's costs without finding which set of rules, and concomitantly, which set of fees and costs, applied to the dispute. Second, we note that the arbitration clause specifically states that the AAA will not conduct the arbitration unless the parties

agree otherwise. Therefore, the arbitration clause remains ambiguous as to whether it even contemplates the fees and costs charged by the AAA, a fact conceded by Colburn. *See* Appellee's Br. Following Remand, at 25 ("Because there is no indication of the organization which would perform the arbitration, customers are given no idea of what the costs of arbitration would be or whether the organization has a history of fairness to customers . . . ."). For these reasons, any discussion of Colburn's potential costs under the AAA rules necessarily is based on speculation and cannot provide an adequate basis for concluding that her costs likely would be prohibitively expensive. As was the case in *Randolph*, the record reveals only that the arbitration agreement is silent on the subject, and that fact alone is insufficient to render the agreement unenforceable. *See Randolph*, 121 S. Ct. at 522. Thus, the district court's articulated reason for denying the motion to compel arbitration is in error.

## B. *The Legality of the Deferred Payment Transactions*

That brings us to Colburn's alternative argument that the deferred payment transactions are void *ab initio* because they violate the Alabama Small Loan Act.[2]

---

[2] Even though the district court did not address Colburn's alternative arguments, we must affirm the district court if its result is correct, even if its reasoning is in error. *See Turner v. Am. Fed'n of Teachers Local 1565*, 138 F.3d 878, 880 n.1 (11th Cir. 1998). Therefore, we consider Colburn's alternative arguments in support of affirmance.

Colburn contends that the court, rather than the arbitrator, must decide the legality of these transactions, and the district court therefore was correct in not compelling arbitration until this issue is resolved. PayDay, by contrast, maintains that the validity of the transactions is an issue for the arbitrator, not the court, and it asserts that its motion to compel arbitration should therefore have been granted. Thus, before considering the legality of the deferred payment transactions, we must decide whether this issue is one for the court or the arbitrator.

The starting point for our analysis is the FAA. The FAA makes valid any written agreement to arbitrate a dispute arising out of a transaction involving interstate commerce, "save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2. Where a party to such an agreement fails or refuses to arbitrate, the other party may move the district court for an order compelling arbitration. *See id.* § 4. The district court must grant the motion if it is satisfied that the parties actually agreed to arbitrate the dispute. *See id.* § 4. If "the making of the arbitration agreement" is in issue, however, the court must first adjudicate whether the agreement is enforceable against the parties. *See id.*; *see also Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 853-54 (11th Cir. 1992).

The resolution of our question, then, turns on whether Colburn's assertions of illegality with regard to the deferred payment transactions place "the making of the

arbitration agreement" in issue. Our answer is informed by the Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S. Ct. 1802 (1967). The plaintiff in that case brought an action in federal court to rescind a contract on the grounds that the contract was fraudulently induced. Invoking the contract's arbitration clause, the defendant moved to stay the action pending arbitration, which the district court granted. The Supreme Court upheld the district court's stay, concluding that a claim of fraudulent inducement of the contract generally was a matter to be resolved by the arbitrator, not the court. *Id.* at 403-04, 87 S. Ct. at 1806. The Court distinguished this claim from a claim that the arbitration clause itself was fraudulently induced, a claim that clearly would put the making of the arbitration agreement in issue. *Id.* Because the plaintiff alleged fraudulent inducement only as to the underlying contract generally, and not as to the arbitration clause specifically, the district court properly stayed the litigation.

Because Colburn's allegations of illegality go to the deferred payment transactions generally, and not to the arbitration agreement specifically, it would appear that, under *Prima Paint*, an arbitrator should decide those questions. Colburn, however, contends that this court's decision in *Chastain*, supported by several decisions from other circuits, mandates a different conclusion. In *Chastain*, this court held that the district court, rather than the arbitrator, must decide the validity of two

12

contracts containing arbitration clauses where it was undisputed that one of the parties to the litigation never signed the contracts. *See Chastain*, 957 F.2d at 853-54. The court distinguished the allegations of fraudulent inducement in *Prima Paint* by noting that, in the case before it, the allegation was "that a contract *never existed at all*," an allegation that the holding in *Prima Paint* did not reach. *Id.* at 855 (emphasis in original). The court also distinguished the unique facts of the case before it with what it described as "normal circumstances," under which "an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration." *Id.* at 854. Under such circumstances, "the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract *in general*." *Id.* (emphasis in original). Where the party seeking to avoid arbitration admittedly did not sign any contract requiring arbitration, however, "there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to the [FAA]." *Id.* Accordingly, before it could decide whether the FAA mandated it to compel arbitration, the district court had to determine whether valid contracts existed, or more specifically, whether both of the parties assented to the contracts containing the arbitration provisions.

13

Likening his void *ab initio* allegations to the contentions in *Chastain* that no contract ever existed, Colburn argues that, as in *Chastain*, the court must determine the legality of the deferred payment transactions before deciding whether to compel arbitration. But the focus of the court's decision in *Chastain*, as just explained, was on the question of assent, i.e., whether the parties mutually had agreed to the contracts. By contrast, Colburn urges that the transactions in this case are void, not because he failed to assent to the essential terms of the contracts, but because those terms allegedly render the contracts illegal under Alabama law. At bottom, Colburn challenges the *content* of the contracts, not their *existence*. Indeed, unlike the contracts in *Chastain*, both the arbitration agreement and the deferred payment contracts were signed by Colburn, and there is no question about Colburn's assent to those contracts. Thus, this case falls within the "normal circumstances" described in *Chastain*, where the parties have signed a presumptively valid agreement to arbitrate any disputes, including those about the validity of the underlying transaction. Therefore, the issue raised by Colburn — whether the deferred payment transactions are void as illegal — is one for the arbitrator, not the court.

None of the decisions cited by Colburn from our sister circuits counsels a different conclusion. Like *Chastain*, all of those cases involved questions of assent to the general contract. *See Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587,

14

590-91 (7th Cir. 2001) (concluding that court, rather than arbitrator, should determine whether agent had authority to bind principal to underlying contract); *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 1104-10 (3d Cir. 2000) (same); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991) (same); *I.S. Joseph Co. v. Michigan Sugar Co.*, 803 F.2d 396, 400 (8th Cir. 1986) (concluding that court, rather than arbitrator, should decide whether assignee of original party could enforce arbitration clause). We are aware of only one other circuit to address the question presented in this case — whether an attack on a deferred payment transaction as illegal under state law is to be decided by the court or by the arbitrator — and that circuit reached the same conclusion that we reach today. *See Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 489-90 (6th Cir. 2001) (concluding that plaintiffs' allegations that deferred payment contracts were void as illegal constituted challenge to substance of loan agreements and should thus be decided by arbitrator rather than by court). Because Colburn's void *ab initio* argument is an issue for the arbitrator, it does not furnish an adequate basis for denying PayDay's motion to compel arbitration.[3]

---

[3] Colburn also relies on the Alabama Supreme Court's decision in *Alabama Catalog Sales v. Harris*, 794 So.2d 312 (Ala. 2000), which held that the court, not the arbitrator, must decide whether deferred payment contracts containing arbitration clauses were void as illegal under the Small Loan Act. *See id.* at 317. Colburn contends that we are bound by Alabama law in deciding defenses to the

C. *The Enforceability of the Arbitration Agreement*

Finally, Colburn contends that the arbitration agreement is unconscionable under Alabama law and is void on its face because it is not dated. Because these contentions place in issue the enforceability of the arbitration agreement itself, they are to be decided by the court rather than by the arbitrator. *See Prima Paint*, 388 U.S. at 404; 87 S. Ct. at 1806 (holding that court should consider issues relating to making and performance of agreement to arbitrate).

1. *Unconscionability*

The FAA allows state law to invalidate an arbitration agreement, provided the law at issue governs contracts generally and not arbitration agreements specifically. *See Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686-87, 116 S. Ct. 1652, 1656 (1996) (stating that "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements"). Under Alabama law, unconscionability is an affirmative defense to the enforcement of a contract, and the party asserting that defense bears the burden of proving it by substantial evidence. *See Green Tree Fin. Corp. v. Wampler*, 749 So.2d 409, 415, 417

---

arbitration agreement and, therefore, *Harris* requires that the void *ab initio* argument be decided by the court. In reaching our decision, however, we are not deciding questions of Alabama contract law; rather, we are deciding the scope of the district court's authority under 9 U.S.C. § 4, a question of federal law.

16

(Ala. 1999); *see also Johnnie's Homes, Inc. v. Holt*, 790 So.2d 956, 964 (Ala. 2001).

Because Alabama law allows unconscionability to invalidate contracts generally, this defense, consistent with the FAA, may also invalidate the arbitration agreement in this case if Colburn proves unconscionability by substantial evidence.

Colburn contends that he has met this burden, relying on *American Gen. Fin., Inc. v. Branch*, 793 So.2d 738 (Ala. 2000), where the Alabama Supreme Court held that an arbitration clause in a loan agreement was unconscionable. Articulating the two essential elements of unconscionability as "(1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power," *id.* at 748, the court identified four indicia of unconscionability in the arbitration clause at issue. First, the arbitration clause — which applied to every dispute relating to every actual or potential transaction, as well as to every person involved in those transactions — was "unusually broad in scope and application." *Id.* Second, the clause vested in the arbitrator the power to decide, in the first instance, whether an issue or dispute was arbitrable. *Id.* at 749. Third, the arbitration clause lacked mutuality of remedy, requiring the borrower to arbitrate while expressly reserving for the lender the right to a trial by jury. This lack of mutuality was compounded by the limitation on the award recoverable in arbitration, which could not exceed five times the amount of economic loss to the aggrieved party. *Id.* Thus, unlike the lender, the borrower was

17

confined both in the right to a forum and in the right to "the full panoply of relief available in state courts under Alabama law." *Id.* These three indicia led the court to conclude that the arbitration clause was grossly favorable to the lender. *Id.* at 750.

The fourth indicia of unconscionability — the borrower's inability to obtain the loan without considerable expense of time and resources — went to the lender's overwhelming bargaining power. The court noted that, at the time the borrower obtained her loans, "the market was virtually closed to consumers seeking comparable financing without agreeing to arbitration provisions." *Id.* at 750. Specifically, the record contained evidence that, at the time of the first loan, only two companies in the borrower's geographic area did not require arbitration agreements. By the time of the last loan, the number of companies not requiring arbitration agreements had fallen to one. *Id.* at 751. This evidence demonstrated that the borrower would have been forced to expend considerable time and resources to obtain the loans without agreeing to arbitrate, and this fact established overwhelming bargaining power. *Id.*

In the same decision, however, the court rejected the same unconscionability argument, raised by a second borrower, as to the same arbitration clause because that borrower did not demonstrate overwhelming bargaining power. At the time the second borrower obtained her loans, the finance companies requiring arbitration agreements in her geographic area were a distinct minority. Moreover, the second

18

borrower testified that she obtained at least two other loans without signing an arbitration agreement, that she did not shop around from other lenders when seeking the loans at issue, that she did not ask any questions about the arbitration clause, and that she did not read the loan agreement. *Id.* at 751-52. For these reasons, the court held that the second borrower could not demonstrate that she had no meaningful choice but to arbitrate. *Id.* at 752.

We find *Branch* distinguishable from this case. Although we agree with Colburn that the arbitration agreement here, like that in *Branch*, is unusually broad, that is the only meaningful similarity between the two cases. Unlike *Branch*, the arbitration agreement in this case does not give the arbitrator the authority to decide issues of arbitrability, nor does it limit Colburn's right to relief. As pointed out by PayDay and the other defendants, nothing in the agreement prevents the arbitrator from awarding "the full panoply of relief" available under Alabama law. And while the agreement requires only Colburn to arbitrate his disputes, without mentioning PayDay's rights or obligations in this regard, this lack of mutuality does not, in and of itself, render the arbitration agreement unconscionable. *See Wampler*, 749 So.2d at 416 (fact that borrower must arbitrate while lender may litigate, standing alone, does not warrant a finding of unconscionability); *see also Branch*, 793 So.2d at 750 (distinguishing provision that requires only one side to arbitrate and also limits

available relief from provision that lacks mutuality but allows all legal and equitable remedies). Thus, we cannot say that the terms of the arbitration agreement grossly favor PayDay.

Similarly, we cannot say that Colburn has demonstrated by substantial evidence that PayDay had overwhelming bargaining power. Although Colburn asserts that the market was "saturated" with arbitration provisions at the time of his deferred payment transactions with PayDay, he supports this assertion by citing only to what he describes as a "composite exhibit" of forms from various lenders throughout Alabama. (R.3-31, Ex. J.) But this exhibit does not reveal how many lenders in Colburn's geographic area, Tuscaloosa and its vicinity, utilize arbitration agreements in deferred payment transactions. Many of the forms appear to come from the same companies, and the majority of the forms appear to be from companies outside the Tuscaloosa area or of unknown location. Additionally, while Colburn's affidavit stated that he engaged in deferred payment transactions with other lenders (R.3-31, Ex. F at ¶ 3), noticeably absent from the affidavit is any mention of these other lenders requiring arbitration agreements. Likewise, we note that none of the other plaintiffs in this case are alleged to have signed an arbitration agreement, suggesting that PayDay did not always require such an agreement in its deferred payment transactions. Unlike the first borrower in *Branch*, then, Colburn simply has not established that the deferred

20

payment transaction market was virtually closed to borrowers not agreeing to arbitrate. *See also Wampler*, 749 So.2d at 417 (concluding that borrower failed to show unconscionability, in part, because record contained no evidence that other similarly situated dealers would insist on arbitration clauses).

Furthermore, like the second borrower in *Branch*, there is no evidence that Colburn asked any questions about the arbitration agreement or that he even read the agreement. In fact, Colburn testified that he did not remember signing the arbitration agreement and that he did not understand what arbitration meant until his attorney explained it to him. Rather, he testified that PayDay told him where he needed to sign, and he did so. (R.3-31, Ex. F at ¶¶ 5-6.) Thus, Colburn has not established sufficient indicia of unconscionability to warrant a determination that the arbitration agreement is unenforceable.

Colburn maintains, however, that there are other indicia of unconscionability in this case; specifically, he points out that the arbitration agreement is silent about the costs of arbitration, that PayDay did not explain the arbitration agreement or expressly offer him a choice, and that he was in dire straits financially at the time of the deferred payment transactions. None of these facts renders the arbitration agreement unconscionable. *See Holt*, 790 So.2d at 960 ("A dealer is under no duty to disclose, or explain, an arbitration clause to a buyer."); *Wampler*, 749 So.2d at 415 (noting that,

where clause was silent about costs of arbitration, "settled principles of Alabama law" prevent court from assuming worst case scenario); *id.* at 416 ("Because the general principles of Alabama contract law do not excuse performance on grounds of financial hardship, we cannot allow a party's poverty, standing alone . . . , to constitute a defense to enforcement of an arbitration agreement.").

For the foregoing reasons, we conclude that Colburn has not met his burden of proving unconscionability by substantial evidence, and his unconscionability argument does not provide an adequate basis for affirming the district court's denial of PayDay's motion to compel arbitration.

## 2. *Void Because Undated*

Lastly, we find no merit in Colburn's argument that the arbitration agreement in the record is void on its face because it is undated. We know of no generally applicable tenet of Alabama contract law that allows a party to avoid contractual obligations simply because the agreement at issue contains no date. Nonetheless, the lack of a date poses a problem to the enforcement of the arbitration agreement. There is only one arbitration agreement in the record, and it clearly requires arbitration only for disputes arising out of or in connection with a single transaction. We have no evidence about when Colburn signed that agreement or whether he signed any other arbitration agreements. Because Colburn cannot be forced to arbitrate disputes he has

22

not agreed to arbitrate, *see Chastain*, 957 F.2d at 854, and because we do not know which specific deferred payment transactions might be subject to arbitration agreements, we cannot say which of Colburn's claims must be submitted to arbitration. Factual development is needed.

Accordingly, we remand this case to the district court. Pursuant to 9 U.S.C. § 4, the district court should "proceed summarily" to a trial on the issue of when Colburn signed the arbitration agreement in the record and whether he signed any other such agreements relating to transactions giving rise to his claims. Should the district court find that any of Colburn's claims against PayDay and the other defendants arise out of transactions subject to an arbitration agreement, it should grant the motion to compel arbitration as to those claims.

## IV. Conclusion

We vacate the district court's denial of PayDay's motion to compel arbitration and remand for further proceedings consistent with this opinion.

VACATED AND REMANDED.